The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons who have an inmate in the form of a business before the Honorable United States Court of Appeals for the Fourth Circuit, I remind you to dry that and give their attention. For the Court is now sitting, the House of Representatives of the United States and this Honorable Court. All right, thank you very much. Please be seated and good morning to all of you. Glad to have the Fourth Circuit present here for a hearing this morning and as we go through this, the lawyers know and you should know we'll use all of the procedures and practices that we use at the Fourth Circuit. Of course, pleased to have Judge Duncan and Judge Agee join us here at the law school this morning. We'll have a chance to say more about them in a bit. But we're ready for argument in the first case, which is Hensley v. Price. Mr. Flanagan. Thank you, Your Honor. And may it please the Court, I think I've reserved five minutes. You have, you have. And I would like to just tell you, the Court, who I have with me here today, I obviously represent the Appellant Defendants, Officer Price and Beasley. Also with me here is a deputy and the Haywood County Sheriff's Attorney, David Weejay-Wicolamo. And also an attorney as well and the Haywood County Manager, Ira Dove. Anybody else you want to introduce? No, sir. Okay. As I do represent the individual defendants, and we are here today on the defendant's appeal of the order of District Judge Reidinger's denial of their motion for summary judgment. As the Court knows, in pertinent part, the denial was based on the officer's assertion of qualified immunity related to, and public official's immunity related to, the 1983 Fourth Amendment claim as well as the related... Is your argument focused on no constitutional violation or no clearly established precedent for the action? Both, Your Honor. Okay. And as you know, it's a two-part test. I do. So we are focused, number first, that there was no constitutional violation under the Fourth Amendment because the officers had a reasonable belief, probable cause, to believe that the, Mr. Hensley, the decedent in this case... You said probable cause. To believe that he... Did they have to have probable cause? Well, under the Tennessee v. Gardner, they had to have reasonable belief, objectable reasonable belief, that the officer, excuse me, that Mr. Hensley posed a serious threat to them. Right. And in this case, they used deadly force, as you know, in response to... That's not probable cause, is it? You're correct, Your Honor. Okay. It's an objectable reasonable standard as to whether they reasonably believe that they had that right to use, though. And you're comfortable taking the facts in the light most favorable to the family? Yes, Your Honor, we are. Under the qualified immunity scenario and why we're here and able to do this under the collateral doctrine is because we accept the facts as found by District Court Judge Reidinger. And we believe, and our contention is, even accepting those facts, there is still, as a matter of law, no violation... But that includes, there's no evidence that he, Mr. Hensley, ever pointed the weapon at any officer. Yes, sir, and that's what the District Court Judge found. He did not point the... Well, you want to tell us what the facts are as you're operating on them? Yes, sir. Just in summary? Yes, sir. And the facts, the undisputed facts are this, that on the morning, early morning of August 9th, 2012, it was light, it was clearly visible to both the officers and the witnesses in this case, which are, of course, the decedent's two daughters, two teenage daughters. On that morning, a 9-1-1... But the proffer of evidence from both parties is starkly different. Yes, sir. So I'm not sure that it being light as opposed to dark is going to help you at this stage of the proceedings. My point there, Your Honor, is this, that the, and I'll get to the facts in just a second, with regard to the ability of Mr. Hensley and the daughters to recognize that these were police officers fully in uniform, in marked cars, pulling into their... But didn't the girls say that? Yes, sir. Didn't the girls say this? That's a fact. They did. At least the girls, and somebody in their vantage point, where the father was, they could tell they were police cars. Yes, sir. And what the girls testified to is that they were, the father and the girls, were standing at the kitchen window when the two police cars came down the hill. And when they saw the two police cars coming down the hill towards their property, Mr. Hensley... I don't know why you need all that. Well, Mr. Hensley... All the operative facts that you have to accept this, that the girls were involved in some kind of altercation, and I'm not using loaded words, some kind of altercation on the porch, that the father, Mr. Hensley, the decedent, had a pistol. Yes, sir. They were scrambling over that. The girls were screaming. He hit one of the girls in the back of the head a couple times with the pistol. Yes, sir. Then he turned, walked off the porch with the pistol, walked out in the yard, and walked briskly toward the police car. That's right. Other facts that are not disputed include that Officer Beasley, who was the first car there, he saw the weapon and immediately fell across the front seat in a defensive posture. The other officer, Mr. Price, he saw that Mr. Hensley was approaching the first police officer's car, Mr. Beasley, and thought, and that's the facts, and all this happened in about 13 seconds. That's correct, Your Honor. Those are the operative facts that you accept. That's correct. As I understood it, both the daughters testified that Mr. Hensley's arms were down by his side, that at no time did he, in fact, point the weapon, and I believe it is undisputed that at no point did the police officers say, drop the gun. It is undisputed. There was no verbal command to stop, drop the weapon, or any announcement of any kind before the firing began. That's correct. There was no announcement by either Officer Beasley or Lieutenant Price prior to firing the weapon. So if those are the facts, what's your clearly established law here? So the clearly established law is this, Your Honor. Based on the assault that took place in the presence, in a violent assault that took place. But there were actions that took place. Are you talking about his hitting his daughter? Yes, ma'am. They didn't respond to that. Time elapsed between their observing that and Hensley stepping off the porch and walking in the direction. So the assault is out of the picture at the point of their response. Well, it's similar to other cases, Your Honor, where there had been a crime that occurred in the presence of the officers. It was a violent crime. Why does that matter to you in your assessment? Because, Your Honor, it matters. I didn't ask you if you thought it mattered. I said, why does it matter? Why? It matters because the officers were in the presence of a violent crime, and it leads to their reasonable belief. They saw a person who, within 13 seconds before they shot at him, assaulted somebody. He had assaultive criminal behavior. And had a gun and had a weapon with him, and then as soon as he was completed the assault, and by the way, the timeline there is the 13 seconds are from when they call in, gun, gun, gun, until the shooting. So they call in, gun, gun, gun, before the assault occurs. But as soon as the assault occurred, Mr. Hensley walked down the stairs and directly towards Officer Beasley, who then was raising up and saw him approach him. All right, so at the time that the officers fired their weapons, what are the operative facts that you say authorized them to shoot? So far, I haven't heard any. The operative facts are this. Mr. Hensley was aware that there were police officers. As the court said in the Cooper case, the officer, someone who approached him. You have to draw the inference that he was aware, but let's assume that he was aware. Well, I think that the facts are, I think the undisputed facts are that he was aware based on the testimony. Let's assume that's right. Assume he was aware, as this court has stated, someone who approaches a police officer knowing they're a police officer, and these are different from some of the cases, the Pena case versus Cooper. That's not going to win the day for you, the fact that he knew there were police officers. I don't know why you're starting there. That's not the key fact that's going to win this case for you, do you think? I agree it's not the key fact, Your Honor. Then I'm wondering why you're talking about it. It's one of the factors, Your Honor, that leads the officers to, when somebody approaches officers knowing they're officers with a weapon after committing a violent crime. Whoa, whoa, whoa. What specifically, anywhere in here is evidence of threatening behavior toward the police? Toward the police. What put the police in fear? Now, you have the daughters testifying that he turned, pinnally turned back and said, mouthed, I love you. And then at no time did my father raise his arm, either arm or point a gun at anybody, including the police officers. He descended the stairs and walked at a normal pace. He was not acting aggressive and did not raise his arms or his hands from his side. So what put the officers in fear? Your Honor, I think the fact, number one, of course, it is the officer's perception, similar to the Sigmund case. No, the Sigmund case is so fact. Well, for one thing, in Sigmund, the officers, as I recall, said stop, cease, drop your weapon. There was no verbal communication here between the officers. The officers said nothing. They didn't say anything in reaction to what we're now calling assaultive behavior on his daughter, who is not complaining of such. So all we had, the only evidence we have of a reaction, the explanation for reaction to the officers in the facts that the children have given, is that their father is walking toward the police with his hands down by his side at a normal pace, not behaving aggressively, and they open fire. And he does have a weapon. So why don't you go to those facts and make your argument? Yes, sir. He does have a weapon after committing a serious violent crime. Is possession of a weapon enough? Well, Your Honor, as you know, you recall that possession of a weapon by itself is not sufficient? Well, the panel has recently, or the Fourth Circuit has recently held in the U.S. v. Robinson case that you're right, not in and of itself. Not in and of itself, and that was why I was focusing on behavior other than the weapon since the fact of the weapon by itself doesn't get you very far. I agree, but as you know, in the U.S. v. Robinson case. Why don't you make your argument under these operative facts while the officers didn't act unreasonably? Isn't that your position? You haven't made that argument yet. Your Honor. Make it with the facts of the case. The facts being that the assault occurred. He's approaching the officer's wife. This is the assault on the daughter. The daughter. Do you make this line of argument in your brief? I'm sorry? Did you make this line of argument in the brief? Because I'm not remembering the assault on the daughter being part of the argument. We did make it. This act, the criminal act that occurred in front of the officers, which would lead them to believe that Mr. Hensley is dangerous. He has a weapon. He's approaching Officer Beasley with that weapon, which would lead Officer Price, who arguably fired the first shot, to believe that he was in serious danger of Beasley. Let me read you this language. Maybe this will focus the argument. This is from our decision in Cooper v. Sheehan from 2013. An officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened, present tense, with the weapon. So, at the point they fired their weapons, what's the threat that authorizes them to shoot? The threat is in their mind. They've just witnessed this assault. What is the threat to them? That following the assault, which leads them, a reasonable person, to believe that Mr. Hensley is dangerous and has used the weapon as part of the assault, he then approaches the officer with the weapon and the officers fire. So that is the threat. That is the threat to the other. So it's the possession of the gun and the previous assault against someone else. In the totality of the circumstances, the possession of the gun, the walking towards the officer. And that is what he is threatening to the officers because it has to be a threat to the officers. Yes, ma'am. The fact that he had just committed a violent crime, which they observed, would lead a reasonable person to believe, a reasonable officer to believe, that as he commits the crime and then approaches the officer with a gun, that would have a reasonable belief that he is. Do the Hensleys agree that his hitting the girl on the back of the head was a violent crime? I don't know that the Hensleys agree or disagree to that. But they certainly admit. They acknowledge that he struck the girl on the back of the head. At least one time while the other daughter was attempting to stop him from doing that. Right. And then he stopped and walked down the steps. He did. Let's start, take the facts as we have them here, and add a few other variables to see how the principle you're describing adds up. So after he hits his daughter with the weapon, the decedent doesn't leave the steps. It stays on the porch for two minutes. Then he comes down the steps exactly the same way it's recounted in the facts. So it's not a 13-second interval. It's a two-minute interval. Does that change your argument? I think that may change the argument, Your Honor, in that it gives the officers more time to make a determination as to what is going on and to assess the situation. Well, what's changed? He still assaulted his daughter with the pistol. He's still got the pistol in his hand. He's still walking toward them. They haven't given him a warning of any kind. How does that make a difference? Well, if they haven't given him a warning and haven't gone through those things, of course there's no case that says you have to give a warning. In the difference that in 13 seconds it's one continuous action? If that's the difference, why don't you answer that question? It is the difference, Your Honor. Well, answer his question. That's what he asked you. I think that is the point I was trying to make, though, is that he's up there. They have a larger opportunity to assess the situation, give warnings if appropriate, and do that sort of thing. This is a rapidly evolving situation. The point what I'm not getting is the focus keeps shifting from behavior that is threatening to the police to an act involving hitting the child on the back of the head to which the officers wasn't directed at the officers and was followed by he stops, he turns, he comes down the steps, hands toward his side, and they open fire. So the only behavior at that point is the possession of the weapon. That's all they have before they open fire. No stop, no drop the weapon, no pointing of the weapon, no immediate threat, which I think you would have to concede. My time is up. May I answer your question? You can answer that question. Yes, sir. The immediate threat, this is a very quick, short situation. The immediate threat to them is these officers in their mind, looking at what they're thinking and what they've seen and what they believe, is that he had just committed this assault, which leads one to believe that he's dangerous, and he then approaches the officer with the gun in his hand still. And do you have any authority for the proposition that that alone, that the possession of the weapon, having witnessed, for the sake of argument, violent assault, is a threat deserving of the response of deadly force? I think many of the cases that we've cited, the Slattery case, the Anderson case, those cases are similar in that there was this. In those cases, a lot of times there wasn't a gun or they didn't even see anything, but those were the imminent threat or at least their perception that there was an imminent threat. When you come back up for rebuttal, why don't you give us your absolute best case that you think is the closest to this? Thank you, Your Honor. All right. Thank you very much. Mr. McClain. Thank you. May it please the Court. My name is Russell McClain. I'm an attorney from Haywood County, North Carolina, and I represent the appellees in this matter. Teresa Hensley is the administrator of the estate of David Hensley and the two daughters, Rachel Ferguson, and now that she's an adult, I'll call her Haley. We've got who you represent. Go ahead and make your argument. May it please the Court. This Court has a standard that it employs for purposes of summary judgment, and this is what this case is about. We've already laid the facts out as we are to consider in this case, haven't we? You have, with some exceptions that I'll highlight in my argument, the qualified immunity argument of counsel does not override ordinary roles applicable to summary judgment proceedings, and this Court has quoted. What I think Judge Shedd might be suggesting is that we demonstrated an awareness of the facts, and I think the critical point here is that we have to take the light, that we have to take the facts in the light that is given to us by the Hensley family. So with that, can you help me? Yes, ma'am. What is it? I still am trying to find out what the immediate threat was to the officers. That's what is in dispute. Those officers both claimed that as my client's husband walked across the yard, that he pointed the pistol directly at the officer with his right hand. They don't get those facts at this hearing. They don't get those facts. Those facts are off the table. That's correct. Although they did testify that he raised his arm, pointed the gun at Beasley twice, and there is, in all fairness, some real slippage in the brief between how the facts are portrayed in the light most favorable to whom. And in our opinion, the light most favorable to the plaintiff is that he never raised his arm. He wasn't being aggressive. Right. He didn't raise his arm. And 13 seconds expired from the time that he had hit his daughter in the head with the gun on the porch. Thirteen seconds passed in which the officers did nothing. They didn't speak to him. They didn't tell him to put a gun down. They didn't tell him to drop the gun, to hit the ground. My client. Do you think they're constitutionally required to do that? I think. You've got a case that says that? Basically what it says is that you judge. No, I ask you. Yes, sir, I have to speak. There's no constitutional requirement that an officer as an absolute warn somebody before he fires. Well, people do have a constitutional right not to be subjected to deadly force under certain circumstances. And I think we're pretty clear about that. What the cases in the line of cases out of the Fourth Circuit and the United States Supreme Court take the position is that you do not, you have to judge the decision of the officers at the moment that they squeeze the trigger. I didn't ask you that. My question was, and I'm pretty sure I know the answer to it, there's no case that says there's a constitutional requirement that in any and all circumstances an officer has to warn before he fires. You're exactly right, sir. There is not a case that says that. That doesn't mean you lose this case, but let's just establish that. What it says is you take the circumstances in its totality at that moment at the time he squeezes the trigger. And we've laid those out, I think. You have. Let's just refresh them to see. You suggested we didn't have them correct. You wanted to add something. No, I didn't mean to do that. Okay. This is this, that the officers saw a struggle on the porch between two women. It turned out to be the daughter and Mr. Hensley. He then struck one of them at least once or several times in the back of the head. He then turned, walked with the gun in his hand to the edge of the porch, off the porch, out into the yard, and then angled toward the police car. That's correct. And all that occurred in 13 seconds. In 13 seconds. What facts don't we have? You did a pretty good job of recounting. And they were on, but they were, I think it's also fair to say, or to point out, that they were on, as I recall, his property. That's correct. They were on his property. They had never known this man. They didn't know a thing about him. From that day, if you look at Mr. Price's statement or Officer Price's statement at 650 or 45 of the second appendage, he had no knowledge of this man. Does it factor in your case that they were on his property? The police had been called to the property. They had. Well, for purposes of my question, and in fairness, I raised it. He's just responding to my question. I'm still struggling with the fact that what we're dealing with is a person who is simply possessing a gun on his own property. And that was the purpose. That was what was behind my question. I understand. I'm a Second Amendment advocate. I'll just tell you straight up. I carry a gun around my property quite a bit. I've got a pretty good track of land. Well, the opposing counsel's argument, as I understand it, is that accepting all those facts, and the light was favorable to you, that that was sufficient under our case law to constitute an immediate threat to the officers so that they were justified in firing. That's his argument, as I understand it. Yes, sir. So, I think your task is to tell us why that's wrong. We don't need to talk about the facts anymore. Just tell us why that's wrong. It's wrong because it has to be judged from the totality of the circumstances at the moment they executed the trigger pull. If that man had been pointing a pistol at me, I probably shot him too. But that's not in dispute. At least that's in dispute. But at least our position is he didn't point the gun. And if he didn't point the gun, then they didn't have the right to exercise that deadly force because he was not a threat. Because if you look at our expert, Marvin Tucker, who is probably one of the most in any and all circumstances, officers can't shoot unless the gun's pointed at them. You don't think that? Oh, absolutely. I do not. You just think under these facts, and that's what you've been asked, to make the point under these facts, basically comes down to constitutional violation, that the officers' actions were unreasonable. They were unreasonable based on our expert opinion, Marvin Tucker, who's a nationally known expert. He said the carrying of a weapon in and of itself is not a given. I don't think that the expert informs us on what the law is. I understand he doesn't, but his position is, as he's trained officers, he is only a potential threat. And it's the moment that he points the gun at somebody makes him an actual threat. And if he didn't point the gun, he's not an actual threat, and therefore that is a Fourth Amendment violation. What's your best case for that proposition? My best case for which proposition? For the immediacy of the threat at the moment. I think you were beginning... I was looking at a couple of the cases that I had cited in my brief that stands for the proposition that it is only the opportunity to have an actual threat when the gun is pointed, but it's also you take it in the context of the totality of the circumstances, which is a standard that this court uses all the time. You have to look at all of the facts to make the totality of the circumstances for the decision that that officer made at the moment... Right, and that was... I was just trying to get to... I think we asked counsel for the officers as well. I'm particularly focused on the immediate... I guess you can tell from my questions... on the immediacy of the threat to which deadly force is applied. And if you have... All we have... Not facts. All we have is that the man didn't point the gun, therefore... If you sort of let me finish my question, you might be able to answer it better. I was interested for authority on that question. What's your best case? My best case is the case that I suggested, Your Honor, that Judge Ridinger wrote in his opinion, which is basically that... Well, that's not exactly precedent, is it? It's not precedent, but he cited... What's your best case that matters? My best case that matters. I like that question, Judge. I'm sure Judge Shedd is thrilled that you like this question. I'm sure he is too, Your Honor. I know. If I kept asking him sooner or later, he'd like one of them. That's correct. And basically, I think it's the case that... Are you familiar with our decision in Cooper v. Sheehan? I am, Your Honor. Did you cite that in your brief? Actually, I didn't, as I remember. I didn't cite that in the brief. You said you did or you didn't? I didn't. I did not. You did not? I did not. I didn't cite it in the brief. I was wondering about that, actually. Well, and truthfully... How about that be your best case, maybe? That might be a good case. And I'd like to suggest that case to this Court. We'll send you a bill afterwards. That's fine, Your Honor, and I appreciate that. And I do... Because Judge Agee pointed out to some very useful language, the police approach a residence and tap on a window. Cooper grabs a shotgun, steps onto the porch with the butt of the firearm in his right hand and the muzzle pointed toward the ground. I brought that case, Your Honor, just in case you were going to ask me about it. You just didn't cite it? I just didn't cite it. Okay. That would seem to me a fairly useful case. We held that the officers could not, on those facts, reasonably believe that he posed a deadly threat sufficient to commence firing without warning. And that's why I was going to suggest to Your Honor that while it wasn't in my brief, I did bring the Cooper case to offer that as some supportive case law. I just want to be sure that I'm thinking there's no evidence in this case that we often have in cases of this type where there will be expert witnesses for both sides that will come in and they will say, officers are trained that at such and such a distance, depending on what the weapon is, that that's the point of no return and they have to fire at that distance because if they don't, then they're subject to assault. You don't have any evidence like that. That's what I call the 21-foot rule, I believe. You don't have any of that in this case at this point. I think if you look, the deceased was probably as equal distance from the girls as he was from the officer. We don't have any evidence about what that was. We don't have any evidence from the experts. We have evidence of what the distance was. We do have evidence of the distance, which was about equal distance from the porch to the car. Why should both of these officers be judged under the same standard? Because both of them said they pulled the trigger. Both of them claim they're the ones that killed him. No, but weren't they in different positions? They were. As far as threat to them and why they fired? One was 15, he said 15 yards. I think he meant 15. I'm not talking about just distance, but I'm talking about what the officer's perspective, I don't mean his perspective on the facts, but his position and perspective on why he fired. Don't they both justify their firing for two different reasons? If you believe the evidence, as they've said. But it's not disputed? It's not disputed. We have to believe it at this point. Yes, sir. One officer said that he was walking toward Beasley's car, and Price said he's the one that shot him. Beasley said he jumped out of the car and pulled. No, but the difference is, what was Beasley's position before the shots were fired? He was in the car. He was more than in the car. And he saw the pistol. He did. He immediately took a defensive position by laying down across the front seat, correct? If you believe Beasley. Well, you have to believe him. Is there any conflicting testimony? Yes, sir, there is. The two girls said their daddy never pointed the gun at them. I didn't say he pointed a gun. I said he saw the gun. Beasley estimated that Hensley was approximately 45 feet from him when Beasley started firing. Was he in the car when he fired? Beasley actually kicked the door open, rolled out of the car, slid down the car, fired the first shot in the ground, according to Beasley. He said the third shot's what dropped him. Price said he dropped him on his first shot, second shot. It wasn't Beasley. Isn't this the truth? Beasley was scared to death. Both of them were, Judge. Beasley was scared to death. He was in his car. When you look at the pictures, Mr. Hensley was approaching toward Beasley's driver's door. That's correct. Beasley had dropped in the car, quite frankly. The only inference is he was scared to death. If you see what he says, he was. He didn't even look up much. He didn't. He then pushed the door open, and quite frankly, he got out to take off running. I call it rolling out is what I think. Right. But that's his perspective. Right. And on why he fired, he was really running away shooting, I think. The other officer's in a slightly different position, and his position is this is Price. Price sees that Officer Beasley has dropped into a defensive position. Actually, Price said he never could see Beasley. If you remember, his vision got narrowed, and he didn't even see Beasley. And then after Price says he fired his second shot, he picked up his radio, put it up to Beasley. Well, just let me say this. In Price, I'm not sure about that one fact. If you saw him lean over before he went to tunnel vision on that weapon that Hensley was carrying, but Price saw somebody with a weapon who he had just seen assault somebody approaching his partner's door, driver's door. That's correct. That's why he fired, isn't it? His justification is to protect. That's exactly what he said. Why aren't those two officers assessed and judged in whether or not their actions are reasonable differently? Because I suggest that Price had no greater right to shoot him than Beasley did. That's what I'm suggesting to this court. In other words, no, I understand your position. It isn't necessarily your argument that it should be assessed differently. But I'm still going to ask the other side, too. Sure. Everybody seems to lump those officers together, and it seems to me there's a very good belief that maybe they ought to be assessed differently. One, is he justified in mortal fear that he's going to be shot? The other is, is he justified in shooting, in this 13 seconds, to protect a partner who has somebody with a gun approaching his driver's door? Because I don't believe that Beasley shot him. If you listen to the tape, you still hear Price on the radio. After he said he hit the ground, fell face down, he picked up the radio, called dispatch, said shots fired, need help. You can still hear shots being fired in the background while Price was claiming he was laying dead on the ground. So you can actually hear the gunshots on the trailer. So what does that mean? Beasley missed. He shot the house up. He assaulted the girls. Beasley did. Beasley missed, assaulted the girls. I don't know if we can have that as a find of facts. But it strikes me that that's a pretty fair reading of the facts. I think Beasley got trapped in that car. The guy came after him with a weapon. He scrambled out of that car, and I think he was running away for fear of his life, shooting. I think that's what happened. And if you look at the photographs of the SBI, that gun was never anywhere except in my client's left hand. He was laying on the ground dead when he rolled him over. These officers never did. But he had the weapon. He had a weapon. That's all he had was a weapon. The other thing that we would like to sum up real quick on the state claims, apparently the judge tied all of the state claims to the immunity issue. I suggest under your case of Myers that even if you find that they're entitled to immunity, the state charges claim still go forward because you still hear Beasley shooting while Price says Hensley's on the ground dead. What about that? In fact, if either there was no constitutional violation, there was not an unreasonable seizure, or if he's entitled under qualified immunity because there's no clear law, how does that impact on the state claims? It shouldn't because you still have Beasley shooting at the girls by the assault claim. What about the infliction of emotional distress? I think it's negligent. I lost the claim on intentional because I think the judge was right in that. I think it's a negligent claim under state law. But you think even if they were justified to shoot, that you still would have a claim that in their justification to shoot, they still could have a state tort against them? Yes, sir, I do. And I may be wrong on that, but that's my position. And I think the count-off supports the claim because Beasley Well, I figured that would be your position. I was just asking if you had any support for that. Particularly when the threat had ended and you still hear gunshots at the girls. That's the critical distinction. And I think that's the thing that makes it survive, if that makes sense. I'm supposed to sum up, so I will sum up and say that I believe the judge's writing was correct and that there's material issues, facts sufficient to allow this case to go before the jury, that when the cases are in dispute, if the jury could find for the plaintiff from the set of facts as outlined, then the case should be affirmed and the matter remanded to the district court for a trial on the merits and we would let the fact finders make those determinations. Thank you, Your Honor. Thank you, Mr. McClain. Mr. Flanagan, you have five minutes and I think you have some questions they've asked you to be prepared to answer. Yes, sir. Thank you, Your Honor. Judge Peggy, I think that the question was what is the best case, and I think the cases we cited in our brief are all similar to these. Tell us what number one is. Yes, sir. I think the Anderson v. Russell case that we cited is perhaps number one. I think, though, that also... Why? It would help me specifically if in those cases the officers didn't order. The problem is that in the cases that I recall in your brief, all of the officers ordered the person that they are saying is threatening to drop their weapon or stop. So if you have any cases where you don't have that, that would help me. There's not any cases I'm aware of that say that specifically. But I will say this. I'm not arguing the point. I was just asking for a slightly finer focus on the authority from my perspective. That's all. Yes, ma'am. As you pointed out, of course, there's no requirement they have to. I think that's the key point here under the qualified immunity scenario as well is there's not a case that's right on point with this specific facts of the case. Could I ask? But that's sort of why you have juries if there is, taken the facts in the light most favorable to the plaintiff, a fact finder could find that the defendants used excessive force. That just doesn't get them home. It just gets them to a jury. It gets them past the qualified immunity defense. Well, I think if they find that there was a violation that occurred, that's step one. But the plaintiffs have to prove two steps under the qualified immunity scenario, and that is that it was clearly established that it did violate their constitutional right at the time this occurred. Well, they have a right not to be subjected to excessive force, deadly force. We can't be arguing about that. Absolutely not. Okay. So for purposes of my articulation of the standard, you would have to say, would you not, that no reasonable fact finder, taking the facts in the light most favorable to Hensley, could determine that the defendants used excessive force. I think under the qualified immunity standard, under step two, what has to be shown, what the plaintiffs have to show, is that there was a case that's almost beyond debate, similar to this one, where the factual scenarios were the same. Qualified immunity is a question of law. Correct. So what we're focusing on now is, for purposes of answering that question of law, we have to accept the facts, which you do in summary judgment, in the light most favorable to the Hensleys. Correct? I agree. Okay. So what we have to be able to show is, to apply the qualified immunity protection, you have to be able to find that those facts would not allow a reasonable fact finder to conclude that the officers used excessive force. That's actually kind of a, sort of a black letter statement of law. I don't think you could. Which is a legal issue for this panel to decide. Not the factual issue. I agree. That's all I'm saying. I agree. Not the factual issue. Your argument has to be, I take it you're trying to make it is, first of all, qualified immunity never goes to the jury, does it? It does not. Qualified immunity is a right that some people have in some circumstances not to go to the jury. So on the facts, as you argue them, and here we've already established them, and I hope we have, what we have in front of us, you have to argue either that this was not a constitutional violation because the officers did not act unreasonably under the circumstances, or you have to show what they did under the circumstance does not clearly violate some established law. You would say, I take it, that the fact you can't use excessive force, as the Supreme Court says, that's too generalized a concept. That's right. How do you make your argument in light of all that? Just make your argument. Again, Your Honor, under that White v. Polley case, the Supreme Court case that came out this year, that's exactly what they said, that there has to be a specific case under very similar facts beyond debate that says that it was clearly established that they did violate. No, no, no, because that leaves out the factual component. You're in the context of summary judgment. Well, you have to deal with the factual underpinnings. You're right that you can't define the right at a high level of generality, but excessive force can only be determined on the basis of a set of facts. But the facts themselves don't have to be identical to a precedent. Do they? May I? You're to answer. The situation? Yes, they do. They have to be. They don't have to be identical, but they have to be extremely similar beyond debate, as the Supreme Court said. No, that's not the part that has to be beyond debate. Well, they have to be. It has to be the same scenario. So if these officers are confronted with the same or very, very similar facts as other officers, there has to be clearly established that those facts, under those facts, it established it violated a, you know, in this case. Is that an argument you made in your brief? And do you have any authority for it? Well, tell us first. Did you make the argument in your brief that you just made in the last minute? We supplemented it with the white versus public discourse, but we made the argument. Well, that's not, the Supreme Court didn't really make new law there because they've kind of been plowing the same furrow for a long time. But I don't recall you making this argument in your brief or before the district court, so you tell us if I'm wrong. That under these, yes, we did, Your Honor. In fact, we argued that this was more similar to the Sigma case and less and not similar to the Pena versus Porter case, which is what the plaintiffs were arguing. Well, the point of the Supreme Court case, as I'm understanding it, is that a district or trial court errors if they analyze the qualified immunity issue at too general a level. And it needs to be more granular, not less granular. I don't recall seeing that argument in your brief. I don't think it was specifically made in the brief under those terms. Did I answer your question? I think we're done. Thank you very much, and let me say, following the procedures we used at the Fourth Circuit, we'll now step down and greet the lawyers and thank them for their advocacy in the case. I'll go straight on to the next case. Sure.
judges: Dennis W. Shedd, Allyson K. Duncan, G. Steven Agee